UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAMBRIA COMPANY LLC,

    Plaintiff,

        v.

PHILADELPHIA INDEMNITY

INSURANCE COMPANY,

    Defendant.

Case No.: 2:24-cv-01913-MEMF-MBK

**ORDER GRANTING DEFENDANT'S REQUEST FOR JUDICIAL NOTICE [DKT. NOS. 75-76], DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 72]**

Before the Court is the Motion for Summary Judgment filed by both parties, Dkt. No. 72, and Defendant's supporting Requests for Judicial Notice, Dkt. Nos. 75-76. For the reasons stated herein, the Court hereby GRANTS the Requests for Judicial Notice, DENIES Defendant's Motion, and GRANTS IN PART Plaintiff's Motion.

## I.    Introduction

This action arises from an insurance dispute between Cambria Company LLC ("Cambria"), which sells quartz slabs, and Philadelphia Indemnity Insurance Company ("PIIC"), which sells

1

liability insurance. Cambria purchased liability insurance from PIIC. Cambria faces dozens of lawsuits from third-party contractors who fabricated and installed Cambria's quartz products. PIIC claims that its insurance terms do not require it to cover the lawsuits Cambria faces.

On March 8, 2024, Cambria filed the instant action in federal court. Dkt. No. 1. In the operative Complaint, Cambria states two claims: that PIIC breached its contractual duty to defend Cambria in the lawsuits it faces, and that it breached its contractual duty to indemnify Cambria by disclaiming all coverage in relation to those lawsuits. Dkt. No. 59 ("1AC") at ¶¶ 57-78. For those claims, Cambria seeks declaratory judgment and damages. *Id.*

On July 31, 2025, the parties filed the instant Motion for Summary Judgment. Dkt. No. 72 ("MPA"). Pursuant to this Court's Civil Standing Order, the motion is in the form of a joint memorandum of points and authorities. *Id.* In the MPA, PIIC moves for summary judgment on both the duty to defend and the duty to indemnify claims. *Id.* at 1. In response, Cambria argues that it— not PIIC—is entitled to summary judgment on the duty to defend claim. *Id.* at 30. The parties concurrently filed a joint evidentiary appendix, Dkt. No. 72-1, supporting exhibits and declarations, Dkt. Nos. 72-2 to -23, and two joint statements of uncontroverted facts. Dkt. No. 73 ("SUF"); Dkt. No. 74 ("ASUF").

In support of summary judgment, PIIC filed a Request for Judicial Notice. Dkt. No. 75 ("First RJN"). It filed a second Request for Judicial Notice in support of its reply on summary judgment. Dkt. No. 76 ("Second RJN").

The Court held a hearing on the motions on Thursday, November 13, 2025.

**REQUESTS FOR JUDICIAL NOTICE (DKT. NOS. 75-76)**

A court may judicially notice facts that: "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under this standard, courts may judicially notice "*undisputed* matters of public record," but generally may not notice "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). It is

2

appropriate for courts to take judicial notice of court filings and other matters of public record, such as filings in other litigation, as they are readily verifiable. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 n.6 (9th Cir. 2006).

In support of the Motion, PIIC's First and Second RJN ask that the Court judicially notice the complaints that Plaintiff's Complaint identified as the sixty-nine underlying bodily injury lawsuits currently at issue in this case ("Underlying Lawsuits"). *See* SUF ¶ 10 (noting it is undisputed that "Cambria's [FAC] in this action identifies sixty-nine Silica Lawsuits."); *see also* Dkt. No. 59 ("1AC"), Ex. A (listing the Underlying Lawsuits). The Court hereby incorporates Defendant's list of the complaints and case numbers into this Order by reference. First RJN ¶¶ 1-69; Second RJN ¶ 1.

This Court finds that these documents are properly subject to judicial notice. *See* Fed. R. Evid. 201(b)(2). It appears that these exhibits are frequently referenced in the parties' submissions, and they are verifiable court records that cannot reasonably be disputed. Moreover, Cambria does not object to PIIC's request. The Court, therefore, will take judicial notice of the existence of these documents, but not of any disputed facts contained therein.

## **MOTION FOR SUMMARY JUDGMENT (DKT. NO. 72)**

### II.    Applicable Law

#### A.    Summary Judgment Standard

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Id.*; *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The

Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 322–23.

### B. Choice of Law

California's general choice of law rules instruct courts to conduct a governmental interest analysis to resolve possible conflicts of law. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006). As the Supreme Court of California has instructed:

> [T]he governmental interest approach generally involves three steps. *First*, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. *Second*, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. *Third*, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state," and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."

*Id.* (emphasis added) (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976)). A true conflict exists where, at the second step, the Court finds that "each of the states involved has a legitimate but conflicting interest in applying its own law." *Id.* at 925. Under California choice of law rules, the foreign law proponent bears the burden of establishing a true conflict. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001).

Some California courts have indicated that "[S]ection 1646 [of the California Civil Code] is the choice-of-law rule that determines the law governing the *interpretation* of a contract." *Frontier Oil Corp. v. RLI Ins. Co.*, 63 Cal. Rptr. 3d 816, 821 (Cal. Ct. App. 2007). Under this statute, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it

is made." Cal. Civ. Code § 1646. Other California courts suggest that Section 1646's applicability to choice-of-law disputes remains an open question. *See, e.g.*, *The Pep Boys Manny Moe & Jack v. Old Republic Ins. Co.*, 316 Cal. Rptr. 3d 600, 615 (Cal. Ct. App. 2023), review denied 202 ("*Frontier Oil* concluded that section 1646 is a choice-of-law rule (although the California Supreme Court has never cited it as such) and the California Supreme Court has not judicially abrogated it or limited it. . . . In any event, we need not wade into these deep waters and determine which choice of law analysis governs."). The California Supreme Court has not endorsed or rejected the choice of law approach of the *Frontier Oil* Court.

### III.    Findings of Fact[1]

The Court finds the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

Cambria is a private business which manufactures and sells quartz surface products. ASUF ¶ 1. It manufactures quartz slabs, commonly used for countertops, kitchen islands, backsplashes, and tiling in residential and commercial spaces. *Id.* ¶ 2. Cambria prepares its quartz slabs from natural quartzite stone, which is mined from the earth, and then processes that stone into its slab products. *Id.* ¶ 56. The slabs that Cambria manufactured in connection with this case were solid and uncut; it shipped those slabs to distributors and fabricators around the country. *Id.* ¶ 3, 5. It manufactures those slabs in Minnesota. *Id.* ¶¶ 22-23.

Since 2000, Cambria has held insurance issued by PIIC. *Id.* ¶ 9. These include policies PHPG124578, effective between 2000 and 2001, and PHPK014676, effective between 2001 and 2002 (collectively, the "Primary Policies"). *Id.* The Primary Policies noted that PIIC agreed to "pay the sums that the insured [Cambria] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* ¶ 12. Accordingly, in issuing the

---

[1] The facts set forth below are taken from the parties' Statements of Uncontroverted Facts. Dkt. Nos. 73, 74. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute. This Court is also in receipt of Cambria's Objections to Evidence Submitted in Support of PIIC's Motion for Summary Judgment. Dkt. No. 77. The Court did not find any evidence objected to essential to finding any fact stated herein, and therefore need not reach the Evidentiary Objections.

Primary Policies, PIIC undertook a "duty to defend [Cambria] against any 'suit' seeking those damages." *Id.* ¶ 13. The Primary Policies defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* ¶ 14. To be within the Primary Policies' ambit, bodily injury would need to be caused by an occurrence that takes place in the coverage territory—which the Primary Policies defined as the United States. *Id.* ¶ 15, 17. For coverage to apply, the bodily injury would also need to occur during the policy period. *Id.* ¶ 15. The Primary Policies also include an exclusion for pollution-related bodily harm (the "Total Pollution Exclusion" or "TPE"), which states that the insurance's coverage "does not apply to 'bodily injury' which would not have occurred in whole or in part but for the actual, alleged or threatened discharged, dispersal, seepage, migration, release or escape of 'pollutants' at any time." *Id.* ¶ 21. The Primary Policies define "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* ¶ 22.

Beginning in January 2020, Cambria was named in lawsuits in which plaintiffs alleged bodily injury in connection with the fabrication of Cambria's quartz products. ASUF ¶ 26. Cambria now faces at least sixty-nine such suits ("Bodily Injury Lawsuits") in California state courts. *Id.* ¶ 29, 30. All of the plaintiffs in the Bodily Injury Lawsuits worked for third-party fabrication businesses. *Id.* ¶ 6. None of the Bodily Injury Lawsuit plaintiffs worked for Cambria. *Id.* ¶ 7. And the Bodily Injury Lawsuits allege that the underlying plaintiffs suffered bodily injury during PIIC's policy periods—that is, between 2000 and 2002. *Id.* ¶ 35. The harm alleged in the Bodily Injury Lawsuits generally relates to the inhalation of respirable crystalline silica dust, which can result from the fabrication of stone products. *Id.* ¶ 12.

Cambria tendered the Bodily Injury Lawsuits to PIIC for coverage. *Id.* ¶ 47. PIIC has denied coverage based on the Total Pollution Exclusion. All of PIIC's denial letters state that, "[w]ithout limitation, the disclaimer is based on a Total Pollution Exclusion contained in the Policies, which precludes coverage as to all of the Lawsuits." *Id.* ¶ 49.

**IV.    Discussion**

7

PIIC argues that, as a matter of law, it is entitled to summary judgment on Cambria's duty to defend and duty to indemnify claims. For the reasons below, this Court DENIES summary judgment.

### A. California's Choice of Law Rules Point to California Law.

As a threshold matter, the parties dispute what law applies: PIIC argues that Minnesota law should govern this case, and Cambria argues that California law should govern. The parties also dispute how to resolve that dispute: PIIC argues that this Court should apply the Section 1646 test that some California courts apply in instances of contractual interpretation questions, while Cambria argues that this Court should perform a traditional governmental interest test analysis to identify and then resolve a true conflict between California and Minnesota law.

This Court addresses the framework question before applying its chosen framework.[2] For the reasons discussed below, this Court finds that the governmental interest test is the appropriate framework, and that that framework points to California law.

### a. The governmental interest test is the appropriate choice of law framework.

As the Ninth Circuit has recognized, "[t]here appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test . . . or the test of Cal. Civ. Code § 1646." *Arno v. Club Med Inc.*, 22 F.3d 1464, 1469 n.6 (9th Cir. 1994).

On one hand, as PIIC argues, a California appellate court has indicated that "[S]ection 1646 [of the California Civil Code] is the choice-of-law rule that determines the law governing the *interpretation* of a contract." *Frontier Oil Corp.*, 63 Cal. Rptr. 3d at 821. The *Frontier Oil* Court reasoned that Section 1646 "was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation." *Id.* at 827. And, when

---

[2] PIIC argues that this Court need not engage in a choice of law analysis because California and Minnesota are in accord that the TPEs in the PIIC Policies apply to bar a defense and indemnity obligation to Cambria for the claims at issue in this case." MPA at 3–4. But PIIC's suggestion is at odds with trial courts' recognition that choice of law is a "threshold issue." *See, e.g.*, *Whitesell v. Liberty Life Assurance Co.*, 650 F. Supp. 3d 832, 834 (N.D. Cal. 2022). Moreover, the approach would be inefficient: It would effectively require this Court to reach the merits and find for PIIC under both bodies of law, to determine that the similarity in outcome itself indicates identicality between California and Minnesota law. Nor would that mere fact—that two bodies of law would reach the same *outcome*—be sufficient to find that the laws *themselves* are not in conflict.

relevant precedent exists from a state's intermediate appellate court, this Court "must follow the state's intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co.*, 851 F.3d 976, 982 (9th Cir. 2017) (quoting *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007).

On the other hand, as Cambria notes, California courts have not uniformly adopted the *Frontier Oil* approach. For one, another intermediate appellate court has suggested that the *Frontier Oil* approach "may well be dicta," declining to determine whether it viewed the governmental interest test as the right framework for resolving conflicts of law. *Pep Boys*, 316 Cal. Rptr. 3d 600 at 615. Even in the Second District—where the *Frontier Oil* Court was located—the Court of Appeal has more recently suggested that the governmental interest test was the right one after all. *See Textron Inc. v. Travelers Cas. & Sur. Co.*, 259 Cal. Rptr. 3d 26, 37 (Cal. Ct. App. 2020) (applying governmental interest test to resolve a matter of contract interpretation). The governmental interest test has support from the California Supreme Court: As a general matter, it has endorsed the governmental interest test to resolve conflicts of law. *Chen v. Los Angeles Truck Centers, LLC*, 444 P.3d 727, 730 (Cal. 2019). While it has yet to declare whether that approach unsettles the Section 1646 test when it relates to issues of contract interpretation, it is not clear how it would rule when facing this question.

This Court finds that, after a careful review of the parties' authorities and its own research, there is reason to think that the California Supreme Court would favor the governmental interest test over the statutory one. First, post-*Frontier Oil*, more recent intermediate appellate courts appear to be moving in the direction of the governmental interest test. *See Pep Boys*, 316 Cal. Rptr. 3d 600 at 615; *Textron Inc.*, 259 Cal. Rptr. 3d at 37. Second, as the *Pep Boys* Court notes, the California

9

Supreme Court has never cited Section 1646 as a choice of law rule.[3] 316 Cal. Rptr. 3d 600 at 615. And third, this is consistent with how the Ninth Circuit has treated this question in the past. In its words, "California conflicts law has developed significantly since the original enactment of California Civil Code § 1646 . . . . California law [has] moved away from a mechanical choice of law process to employ the 'governmental interest analysis' approach." *Strassberg v. New England Mut. Life Ins. Co.*, 575 F.2d 1262, 1263–64 (9th Cir. 1978).

For that reason, this Court finds that the likely approach the California Supreme Court would follow is that of the governmental interest test. Finding this is the correct test, it moves on to apply it.

b. The laws of California and Minnesota are not substantively identical.

As a threshold matter, this Court must determine whether the laws of California and Minnesota differ. For the reasons below, it finds that they do.

PIIC argues that California and Minnesota take substantially identical approaches in their interpretations of pollution exclusions in insurance coverage claims, so this Court need not move to the later steps of the choice of law analysis. But Cambria argues that California law materially differs from Minnesota law in how it interprets pollution exclusions. It notes that "[i]n California, the pollution exclusion is construed based on the insurance industry's recognition that the exclusion was intended to 'exclude traditional environmental pollution rather than all injuries from toxic substances.'" MPA at 21 (quoting *MacKinnon v. Truck Insurance Exchange*, 73 P.3d 1205, 1210 (Cal. 2003)). It argues that this differs from Minnesota, which reads pollution exclusions more broadly. *Id.* at 21-22.

Of course, "[t]here is obviously no [choice of law] problem where the laws of the two states are identical." *Hurtado v. Superior Court*, 522 P.2d 666, 669 (Cal. 1974). But this Court finds that

---

[3] At the hearing on November 13, 2025, PIIC argued that *Pep Boys* does not clearly endorse the governmental interest framework for determining choice of law in this context. This is consistent with this Court's reading of the opinion, which declined to "wade into the[] deep waters" of determining which analysis governs. 316 Cal. Rptr. 3d 600 at 615. But the *Pep Boys* Court does cast doubt on the utility of the Section 1646 framework. *Id.* This, in conjunction with the other arguments discussed above, sufficiently tips the scales in favor of applying the governmental interest framework.

the laws of the two states are, as Cambria argues, distinct. To explain why, an analysis of each jurisdiction's relevant law is in order.

First, it appears to this Court that Minnesota and California binding authority point to similar factors. As PIIC notes, Minnesota law appears to take a "plain meaning approach to pollution exclusion interpretation." *Cont'l Cas. Co. v. Advance Terrazzo & Tile Co.*, No. CIV. 03-5446MJDJSM, 2005 WL 1923661, at *4 (D. Minn. Aug. 11, 2005), *aff'd*, 462 F.3d 1002 (8th Cir. 2006). That case, in turn, cites *Board of Regents of University of Minnesota v. Royal Insurance Co. of America*, 517 N.W.2d 888 (Minn. 1994). There, the Minnesota Supreme Court noted that the pollution exclusion applied to the release of asbestos fibers. *Id*. at 889. The appellants argued that asbestos fibers "are a naturally occurring mineral, not a waste material." *Id.* at 892. But the exclusion in that case explicitly included "other irritants, contaminants, or pollutants"; in light of this, the Court determined that it "would be doing a disservice to the English language if [it] were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, were not an irritant." *Id.* But Minnesota courts do not only consider the plain meaning of pollution exclusions. Instead, "[p]rovisions in an insurance policy are to be interpreted according to both plain, ordinary sense and what a reasonable person in the position of the insured would have understood the words to mean." *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 634 (Minn. 2013) (citing *Farmers Home Mut. Ins. Co. v. Lill*, 332 N.W.2d 635, 637 (Minn. 1983)).

California law considers similar factors in its analysis of interpretation of pollution exclusions. The Supreme Court has interpreted pollution exclusions based on the "common connotative meaning of the term ['pollutant']." *MacKinnon*, 73 P.3d at 1216. This is analogous to Minnesota's "plain, ordinary sense" standard. And, just as the Minnesota Supreme Court considered "what a reasonable person in the position of the insured would have understood," *Wolters*, 831 N.W.2d at 634 (citing *Farmers Home Mut. Ins. Co.*, 332 N.W.2d at 637), the California Supreme Court has considered whether "a reasonable policyholder would think of the act . . . as an act of pollution" *MacKinnon*, 73 P.3d at 1217.

But where the jurisdictions appear to differ is on whether pollution exclusions should be confined to "traditional environmental pollution." *Wolters*, 831 N.W.2d at 635-36. "A majority of

jurisdictions limit the exclusion to situations involving traditional environmental pollution." *Id.* at 635. "A minority of jurisdictions apply the pollution exclusion literally, finding the terms clear and unambiguous and holding that the exclusion is not limited to traditional environmental pollution." *Id.* The California Supreme Court in *MacKinnon* has identified the same dichotomy between the narrower majority and broader minority approach. 73 P.3d at 1209 n.2.

Minnesota follows the minority approach. *See Wolters*, 831 N.W.2d at 637 (citing *Board of Regents*, 517 N.W.2d at 892); *see also Cont'l Cas. Co.*, 2005 WL 1923661, at *5 ("[T]he Minnesota Supreme Court's decision in *Royal* and the multiple published Minnesota Court of Appeals' opinions clearly indicate that Minnesota follows the minority view when interpreting the pollution exclusion."). It takes a "'non-technical, plain meaning approach' to interpreting pollution exclusions." *Wolters*, 831 N.W.2d at 637. This has led to the Minnesota Supreme Court determining that nontraditional environmental pollution, such as the release of carbon monoxide, falls within the plain-text ambit of pollution exclusions in insurance contracts. *Id.*

But California follows the majority approach. *See MacKinnon*, 73 P.3d at 1217. In fact, contra *Wolters*, the California Supreme Court has approvingly cited a case in which the Tenth Circuit concluded that carbon monoxide does *not* fall within the ambit of pollution exclusions in insurance contracts. *See id.* at 1216 (citing *Regional Bank of Colo. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994)). Accordingly, the *MacKinnon* Court "[l]imit[ed] the scope of the pollution exclusion to injuries arising from events commonly thought of as pollution, i.e. environmental pollution." *Id.* at 1216. And, in the wake of *MacKinnon*, California courts have found that "pollution exclusion clauses bar coverage for an act of negligence involving a pollutant if the negligent act is commonly thought as environmental pollution." *Am. Cas. Co. v. Miller*, 71 Cal. Rptr. 3d 571, 581 (Cal. Ct. App. 2008).

In sum, though the laws are not wholly dissimilar, this Court finds that the laws of Minnesota and California materially differ in their interpretation of pollution exclusions. California looks to whether the alleged pollution is "traditional environmental pollution," and Minnesota does not. On the first step of the governmental interest test framework, then, this Court finds a conflict.

      c.  <u>Both jurisdictions have a legitimate interest in applying their rules of decision.</u>

This Court must next determine whether a *true* conflict exists here. "If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a 'false conflict' and the law of the interested jurisdiction is applied." *McGhee v. Arabian Amer. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989). "On the other hand, if more than one jurisdiction has a legitimate interest, 'the court must move to the third stage of the analysis[.]'" *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). Cambria argues that both jurisdictions are interested, such that this is a true conflict; though PIIC addresses the possibility that the governmental interest test applies, its briefing takes no explicit position as to which jurisdictions are interested.[4] For the reasons below, this Court finds that both jurisdictions have legitimate interests in the application of their rules of decision.

It seems to this Court that California has an interest in the application of its law. California courts interpret insurance coverage "broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer." *White v. Western Title Ins. Co.*, 710 P.2d 309, 313 (Cal. 1985). As Cambria notes, California has a logical interest in regulating conduct within its borders. This case implicates conduct in California: The Bodily Injury Lawsuits are pending across California courts, and the disposition of this suit concerns whether PIIC has a duty to defend Cambria in those suits. Moreover, "California's paramount interest is in protecting its residents." *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 17 Cal. Rptr. 2d 713, 720 (Cal. Ct. App. 1993). Many of the Underlying Plaintiffs allege that they are citizens of California, so the application of California law in this case would inform from whom the Underlying Plaintiffs can seek to recover for the harm they have suffered. *See generally* First RJN; Second RJN. Of course, whether Cambria or PIIC is financially responsible for the harm that the Underlying Plaintiffs may have suffered, that determination would not necessarily adversely impact the Underlying Plaintiffs themselves. Still, as this Court noted in its Order Denying PIIC's Motion to Transfer, Dkt. No. 33 ("Transfer Order"), "the state in which the particular risk is involved is

---

[4] As PIIC is the proponent of foreign law in this matter, it bore the burden to establish that a true conflict existed. *Kearney*, 137 P.3d at 922.

California," as that is where Cambria's products appear to have been sold, and where much of the Underlying Plaintiffs' alleged harm ensued. *Id.* at 13.

Minnesota also appears to have some interest in the application of its laws. "[E]very state has an interest in having its law applied to its resident claimants." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591–92 (9th Cir. 2012) (alteration in original) (quoting *Zinser,* 253 F.3d at 1187), *overruled in part on other grounds*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). Cambria is a resident of Minnesota. SUF ¶ 8.

In sum, both California and Minnesota have legitimate and competing interests in the application of their laws. For that reason, a true conflict exists.

        d.   California has a greater interest in the application of its laws.

At the third step of the governmental interest framework, this Court must "compare[] the nature and strength of the interest of each jurisdiction in the application of its own law." *Kearney*, 137 P.3d at 922. It does this to "'determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state,' then ultimately appl[y] 'the law of the state whose interest would be the more impaired if its law were not applied.'" *Id.* (quoting *Bernhard*, 546 P.2d at 723). For the reasons below, it finds that California's interest overrides.

PIIC argues that Minnesota's interests are greater than those of California. It relies on *Stonewall* for the proposition that

> there are numerous relevant contacts in determining which state's law applies to a coverage dispute under the governmental interest approach, including the place of contracting, negotiation of the contract, and performance, the location of the subject matter of the contract, and the domicile, residence, nationality, and place of incorporation and place of business of the parties.

MPA at 19 (citing 17 Cal. Rptr. 2d at 718). It argues that application of California law would run counter to the parties' expectations, noting that at the time that the insurance policies were issued, "Cambria had not even begun to do business in California." *Id.* In opposition, Cambria relies on a different part of *Stonewall*, noting that "in the liability-insurance context, 'particular importance is placed on the location of the subject matter of the contract, *i.e.*, the location of the insured risk.'" MPA at 22 (citing 17 Cal. Rptr. 2d at 718). It argues that PIIC's contention—that the California risks

14

were unforeseen to PIIC at the time of the issuance of the policies—is not relevant, and even if it were, that the policies' definitions themselves contradict that argument. *Id.*

Having applied the governmental interest test articulated in *Pep Boys*, this Court is in the position it first discussed as relevant to the Transfer Order. At that time, this Court noted that it appeared that "the state in which the particular risk is involved is California, as that is where the defective product was sold and where the harm occurred." Transfer Order at 13 (citing *Stonewall Surplus Lines Ins. Co.*, 17 Cal. Rptr. 2d at 717). For the reasons below, this Court similarly finds now that California's interests are greater than those of Minnesota, such that California would be more prejudiced by the application of another jurisdiction's laws.

PIIC's main argument in favor of the application of Minnesota law is that it would do more to protect the parties' expectations. It notes that it is undisputed that, for about a decade after the issuance of the relevant insurance policies, Cambria was not doing business in California. *Id.* ¶ 9. PIIC notes evidence to support the idea that the parties intended to avail themselves of Minnesota law, including the insurance policies' listing of Cambria's mailing address as a Minnesota address, the locations schedule listing Minnesota premises, the policies containing endorsements described as "Minnesota changes," and the three automobiles garaged at Minnesota locations.[5] SUF ¶ 1. These facts may well show that PIIC contemplated that Cambria was Minnesota-based at the time it issued Cambria the relevant insurance policies. But it does not logically follow that, because Cambria was Minnesota-based, it is reasonable to expect all of its contracts to necessarily be confined to Minnesota. The parties themselves seemed to contemplate this: As Cambria notes, the parties chose

---

[5] Upon a review of the parties' evidentiary appendix, it also appears to this Court that many of the Minnesota-specific references in the insurance policies were in reference to automobile insurance coverage that PIIC provided. *See, e.g.*, Dkt. No. 72-3 at 30-47. Again, this may well support PIIC's expectations that Cambria's *business headquarters* was centered in Minnesota. But it does not substantiate the idea that Cambria's *business dealings* would be confined to Minnesota.

15

to define the insurance policies' "coverage territory" as "the United States of America." ASUF ¶ 17. The parties' own bargained-for definition of coverage territory is more determinative of the anticipated coverage territory than the indicators that merely pointed to Cambria's presence in Minnesota.

As noted above, PIIC leans on *Stonewall* for the proposition that "the parties[']" contemplat[ion] that the policy would insure risks located in several states" was relevant to the finding that the multistate policy should be treated as "insuring separate risks in the separate states where the relevant corporation did business." MPA at 19. But, as stated, the parties appear to have contemplated nationwide coverage, and the best indicator of this is their definition of the United States as the "coverage territory." ASUF ¶ 17.[6] Nor has PIIC carried its burden of establishing that Minnesota law would be more appropriate—it does not appear to have created a comprehensive factual record on the parties' expectations at the time that the insurance policies were issued (for example, on facts regarding where the contract was negotiated or signed, or the existence of Cambria's interstate operations at the time it secured insurance coverage). For that reason, this Court looks to the parties' coverage territory—the United States—and the relevant location of harm—done in California, to California residents—to find that California's interest is greater than that of Minnesota's.

Accordingly, this Court has found that the laws conflict, that both jurisdictions have an interest in the application of their own laws, and that California law should govern this claim for two reasons: California has a stronger interest in the application of its laws, and PIIC has not established

---

[6] This is consistent with California courts' treatment of "liability insurance polic[ies] issued on a nationwide basis." *Downey Venture v. LMI Ins. Co.*, 78 Cal. Rptr. 2d 142, 164 (Ct. App. 1998). Such a policy "may be construed in accordance with the law of the jurisdiction in which a particular claim arises." *Id.* "Thus, the same policy language may receive different construction and application in different jurisdictions. Parties to an insurance contract understand this." *Id.*

a factual record on the parties' expectations that another jurisdiction's laws would control.  For that reason, California law controls.

**B. PIIC has not met its burden to establish that the Total Pollution Exclusion completely bars coverage.**

Cambria's 1AC states claims stating that PIIC is in breach of two duties it owes to Cambria: the duty to defend and the duty to indemnify. PIIC moves for summary judgment, arguing that California law's interpretation of the TPE conclusively bars Cambria's claims for breach of duties. For the reasons below, this Court finds that PIIC is not entitled to summary judgment on either claim.

a. <u>Cambria, not PIIC, is entitled to summary judgment on the duty to defend claim.</u>

"[T]he duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." *Horace Mann Ins. Co. v. Barbara B.*, 846 P.2d 792, 795 (Cal. 1993). To that end, "in an action wherein all the claims are at least potentially covered, the insurer has a duty to defend." *Buss v. Superior Ct.*, 939 P.2d 766, 774 (Cal. 1997). But when none of the claims is even potentially covered, the insurer has no duty to defend. *Id.* "Any doubt as to whether the facts give rise to duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co.*, 846 P.2d at 796. For the reasons below, this Court finds that PIIC has not met its high burden to demonstrate that no claims are potentially covered.

In arguing for summary judgment, PIIC argues that the TPE—as a matter of law—bars even potential liability for any of the underlying lawsuits. Bodily Injury Lawsuits allege harm from the release silica and silica dust, which a California appellate court found constituted pollution. *Garamendi v. Golden Eagle Ins. Co.*, 25 Cal. Rptr. 3d 642, 646 (Cal. Ct. App. 2005). Relying on *Garamendi*, PIIC contends that the lawsuits fall within the TPE's ambit, and Cambria is therefore not entitled to coverage.

Cambria makes two responses to PIIC's use of *Garamendi*. First, as a threshold matter, Cambria argues—and PIIC does not appear to dispute—that *Garamendi*'s deferential standard of review renders it inapposite. MPA at 46-47 (noting that the *Garamendi* Court conducted a "circumscribed" analysis akin to the abuse of discretion standard). Second, Cambria distinguishes

17

*Garamendi* on the facts: It notes that the alleged pollution in *Garamendi*, unlike here, was "widespread," and that this is an important component of courts' analysis of whether something constitutes "traditional environmental pollution." *MacKinnon*, 73 P.3d at 1210. In other words, the mere fact that another court has found the release of a given substance was pollution does not conclusively decide the issue in all cases featuring the same substance. *See, e.g., Am. Zurich Ins. Co. v. James N. Gray Co.*, No. 13-1966, 2014 WL 11430928, at *5 (C.D. Cal. July 25, 2014) (differentiating *Garamendi* on the basis that it involved a "widespread dissemination of silica dust" in the form of dust clouds from construction-related activities). This Court finds both reasons compelling enough to indicate that *Garamendi* does not bind this Court; as this Court has already discussed, intermediate appellate courts generally bind this Court on interpretations of state law, unless this Court finds specific reason to think that the state supreme court would follow a different approach. *Teleflex Med. Inc.*, 851 F.3d at 982. Because of the unique procedural posture of *Garamendi* and the distinguishable facts involved, this Court finds that *Garamendi* does not settle the issue.

Given this, PIIC cannot establish that no claim is even potentially covered in this matter. As other Courts have found, interpreting California's approach to pollution exclusions as applied to "traditional environmental pollution" can mean that an issue turns on how widespread the dissemination was. *See, e.g., Cold Creek Compost, Inc. v. State Farm Fire & Cas. Co.*, 68 Cal. Rptr. 3d 216, 224 (Cal. Ct. App. 2007) (noting that the relevant pollutants "spread a mile and a half to the plaintiffs' homes," meaning that "they were harmed by a persistent byproduct of Cold Creek's business operations"); *see also Am. Zurich Ins. Co.*, 2014 WL 11430928, at *5. The Bodily Injury Lawsuits, of course, could well differ on the degree of alleged dissemination they feature; it is possible that some of those lawsuits will raise an issue so clear-cut that PIIC can establish the claim is not even potentially covered. But this Court is not best positioned to conduct that fact-specific inquiry, nor does it find that PIIC has created enough of a record to conclude that that inquiry would demonstrate that the TPE bars all claims.

Instead, as PIIC must defend when even some claims are potentially covered, this Court finds that Cambria, not PIIC, is entitled to summary judgment. When a Court, as here, finds that "factual

18

issues exist precluding summary judgment in the insurer's favor," "the duty to defend is then *established,* absent additional evidence." *Horace Mann Ins. Co.*, 846 P.2d at 798. Moreover, this Court does find some reason to think that not all the Bodily Injury Lawsuits feature a dispersal of arguable pollutants in line with the widespread dissemination that California courts look for. *See, e.g.*, ASUF ¶ 42 (noting that the Bodily Injury Lawsuits include allegations that at least some of the Underlying Plaintiffs "suffered bodily injuries as a result of [fabricating stone] in small shops and/or in homes or home kitchens and bathrooms." (internal quotation marks omitted)). As PIIC has not met its burden of proof to show that the suits do not arguably implicate it, PIIC must perform the duty to defend as it relates to Cambria. For that reason, for Cambria, summary judgment is GRANTED.

b.   <u>PIIC is not entitled to summary judgment on the duty to indemnify claim.</u>

PIIC next moves for summary judgment on Cambria's duty to indemnify claim. It does so for the same reasons as its motion on the duty to defend case; PIIC's position is that the TPE conclusively bars its liability in the Bodily Injury Lawsuit cases, and so it has no duty to indemnify Cambria. Notably, Cambria is not cross-moving for summary judgment on the duty to indemnify claim. *See* MPA at 49 ("Cambria respectfully requests that the Court deny PIIC's motion and grant Cambria partial summary judgment on the *duty to defend*." (emphasis added)). This is consistent with the fact that whether PIIC owes a duty to indemnify will necessarily turn on the resolution of the Bodily Injury Lawsuits. So this Court could not ascertain, at this time, the extent of that duty.

As the parties note, the duties to defend and indemnify are not coterminous. *Certain Underwriters at Lloyd's v. Superior Ct.*, 16 P.3d 94, 102 (Cal. 2001) (citing *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 735 (1st Cir. 1990)). If this Court were to find no duty to defend, it would naturally follow that PIIC had no duty to indemnify. This is because, as discussed in the preceding section, the duty to defend is broader than the duty to indemnify: An insured party may well be entitled to defense from the insurance company in a claim for which the insurance company is ultimately not found liable. *Buss*, 939 P.2d at 774.

At this stage, this Court has found that PIIC has not sufficiently shown that it does not bear the duty to defend. For the reasons discussed above, it is not clear that the TPE will conclusively bar

19

all pollution liability in the underlying cases, because whether something constitutes "traditional environmental pollution" may turn on the individual facts of the dissemination of the silica dust or other relevant byproduct. This means that, depending on the factual basis and the outcomes in the Bodily Injury Lawsuits, PIIC may be liable in some of those suits. To that end, finding only that PIIC has not demonstrated conclusively that it has no duty to indemnify, this Court DENIES summary judgment on this basis.

**V.      Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1.  PIIC's Motion for Summary Judgment is DENIED.

2.  Cambria's Motion for Summary Judgment as to the duty to defend claim is GRANTED.

IT IS SO ORDERED.

Dated: March 17, 2026

_____
MAAME EWUSI-MENSAH FRIMPONG
United States District Judge